UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re                          )

MICHAEL L. MCCLUNG,      )     Case No. 8:04-bk-6835-KRM

        Debtor.        )

_____)

NEW BUFFALO SAVINGS BANK,   )

        Plaintiff,     )

v.                   )     Adv. No. 04-412

MICHAEL L. MCCLUNG,      )

        Defendant.     )

_____)

MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR INVOLUNTARY
DISMISSAL OF COUNT II OF THE COMPLAINT (SECTION 523(a)(6))

New Buffalo Savings Bank ("NBSB") seeks to have its $617,485.83 unsecured claim excepted from the Chapter 7 discharge, alleging that the debtor's receipt of about $1 million of the bank's cash collateral two years before the petition date, and the debtor's reinvestment of about $480,000 of such funds in assets that were exempt or immune from collection, was a "willful and malicious injury" to the bank

under Section 523(a)(6) of the Bankruptcy Code.[1]    For the reasons set forth below, the Court concludes there is not sufficient proof of the debtor's intent to injure the bank. The loans were current when he and his wife received the funds and he made substantial, voluntary pre-payments before and after receipt of the funds.    Therefore the bank's claim is not excepted from the discharge.

## BACKGROUND

The Loans

The debtor and his wife, formerly residents of New Buffalo, Michigan, had a long-standing relationship with NBSB. The McClungs had borrowed and repaid an estimated thirty loans over a ten-year period.

On September 25, 2000, the debtor borrowed $900,080 from NBSB to purchase a boat.    About five months later, on March 9, 2001, he borrowed another $200,020 to purchase another boat (collectively, both loans are hereinafter referred to as the "Boat Loans").    Each of the Boat Loans had

---

[1]    Initially NBSB filed a claim in the amount of $753,250.80. After the debtor filed a counterclaim in this proceeding, the parties agreed to the entry of an Agreed Order, allowing the bank's unsecured claim in the amount of $617,485.83 [Dkt. 226].    In turn, the debtor dismissed, with prejudice, its counterclaim and claim objection [Dkt. 10].

2

a ten-year maturity and required only a single payment of
accrued interest each year.

The debtor was the sole obligor on the Boat Loans.
NBSB was aware that the debtor was obtaining the loans without
his wife's knowledge and that he was using the loans to buy
the boats.

NBSB did not take a security interest in the boats,
but elected to obtain alternative collateral: a pledge of the
debtor's interest in a limited partnership known as C. Blair
Partners, L.P. ("C. Blair"), valued at about $1.7 million when
the first loan was made. The debtor, the bank and C. Blair
entered into a four-page "Consent Agreement" [Pl. Ex. 3],
which provides that C. Blair will (1) not distribute funds to
the debtor without notifying NBSB and (2) deposit any funds
that are distributed into a special account to be established
at NBSB.

Paragraph 5 of the Consent Agreement provides:

> Until such time as the
> Partnership [C. Blair] shall
> have received written notice
> from the Bank [NBSB] that the
> afore-mentioned pledge and
> security interest have
> terminated the Partnership shall
> make any and all distributions
> and withdrawals in respect of
> the Collateral (whether made in
> cash or in kind, and whether

> made by the Borrower or
> otherwise) directly to an
> account at the Bank. . . .

Paragraph 6 of the Consent Agreement provides that C. Blair can accept instructions from NBSB, without the consent of the debtor, only after NBSB sends a "Notice of Foreclosure." In the last sentence of paragraph 6, the debtor agrees not to give payment instructions to C. Blair unless the instructions are signed by an officer of NBSB. On the first page of the Consent Agreement, the parties agree that "the [debtor] will continue to be a limited partner of the partnership, and . . . [NBSB] shall not be deemed to be or become a partner in the Partnership by virtue of the pledge and assignment" until the partnership receives a Notice of Foreclosure.

The Consent Agreement grants a pledge of the debtor's interest in the "Partnership." The Consent Agreement does not preclude the debtor from using any distributions or withdrawals, so long as the loans are not in default. The only requirement is that any distributions or withdrawals be deposited in the "Michael McClung Pledgee" account.

NBSB did not file a UCC-1 financing statement for its security interest; nor did it set up the special account

for receipts of any distributions.    Apparently unbeknownst to the debtor, NBSB intended to apply any funds it received to pre-pay the loans.[2]

The promissory note for the first of the Boat Loans expressly recognized that the value of the debtor's partnership account could fall below $1.0 million: in that event, NBSB would "request" additional collateral [Pl. Ex. 2]. Before making the second boat loan, NBSB learned that the partnership account had declined by almost $400,000 from the $1.7 million valuation at the time of the first loan [Pl. Ex. 5].    The second note therefore provided that NBSB could "request" additional collateral if the value of the partnership fell below $1.2 million [Pl. Ex. 4].

It is undisputed that through 2002 the debtor made the scheduled interest payments on time and voluntarily pre-paid about $867,692 of the principal amount of the Boat Loans (about 72%), as follows:

---

[2]    The "account number" in the original Consent Agreement was not an account at all.    It was NBSB's internal number for the initial boat loan. The Consent Agreement did not authorize NBSB to apply such distributions to the outstanding balance of the Boat Loans when the Boat Loans were not in default.

**$900,090 Boat Loan:**

| Date | Principal | Interest |
|------|-----------|----------|
| 03/13/2001 | | $ 3,500.00 |
| 12/27/2001 | $607,580.09 | |
| 03/25/2002 | | 17,920.84 |
| 08/06/2002 | 150,000.00 | |
| | $757,580.09 | |

**$200,020 Boat Loan:**[3]

| Date | Principal | Interest |
|------|-----------|----------|
| 11/01/2001 | $ 85,015.00 | |
| 12/28/2001 | 25,097.00 | |
| 03/11/2002 | | $13,796.68 |
| | $110,112.00 | |

The Distribution of C. Blair Funds

By June of 2002, C. Blair had elected to dissolve the partnership and distribute funds to the limited partners. C. Blair's audited financials, as prepared by Ernst & Young, contain the following note:

> Pursuant to the provisions of the Partnership Agreement, the General Partner elected to terminate the Partnership during 2003. During June 2002, the Partnership ceased all new investment activities, liquidated substantially all of its publicly traded securities, and began to distribute assets to the partners in proportion to their respective capital accounts. A distribution generally representing 90% of each partner's liquid capital was made on or about June 25, 2002, with

---

[3] In October 2001, in addition to the original principal amount of $200,082, the debtor received another $110,030. This additional advance was repaid by payments of $85,015 on November 1, 2001, and $25,097.00, on December 28, 2001.

6

subsequent distributions of approximately
5% and 2% of each partner's liquid
capital made during September 2002 and
January 2003, respectively.

[Pl. Ex. 39 (McClung Affidavit) at Ex. 15 at p. 6]. The
debtor did not control the partnership or its operations.

In 2002, the McClungs received about $1,031,000 from
C. Blair, including about $737,000 in June. [Pl. Ex. 40
(Oscher Affidavit) at Ex. D]. This was done without the
knowledge or consent of NBSB [Pl. Ex. 39 (McClung Affidavit) ¶
20-21]. At the time of these distributions, the debtor was
current on all payments due to NBSB.

The funds were transmitted to the debtor or the
debtor's wife as directed by the debtor. Approximately
$430,000 was wired to Mrs. McClung's bank account in June
2002. She used the funds to purchase two houses in Sarasota,
Florida (the "Monroe" and "Jacinto" properties), which were
titled in the names of the debtor and Mrs. McClung, as tenants
by the entireties. The Jacinto property was purchased with
monies mostly derived from the C. Blair account; the Monroe
property was purchased, in part, from C. Blair funds and by a
mortgage loan of about $300,000.

Another $307,000 was distributed by C. Blair to the
debtor, who deposited these funds into his checking and

securities trading accounts at institutions other than NBSB. These funds were gradually depleted to sustain the McClungs' $20,000 per month lifestyle and pay certain extraordinary expenses, including legal fees.

Other Events in 2002

In March 2002, the McClungs, together, borrowed $900,000 from NBSB, as a "bridge loan," to finance the purchase of a new home in Sarasota before the sale of their prior residence could be closed.  In June 2002, the McClungs repaid this loan in full after their former home was sold and after they obtained a first mortgage on the new home.

After receiving the large C. Blair distributions in June 2002, the debtor pre-paid another $150,000 of principal of the Boat Loans, on August 6, 2002.  The principal amount was thus reduced to about $367,612.  On November 11, 2002, however, NBSB advanced another $100,000 to the debtor; but it did so without verifying the current value of the debtor's C. Blair account.

On the day after advancing the additional $100,000, NBSB learned that C. Blair was terminating and that investments were being returned to the limited partners [Pl. Ex. 6].  The debtor's 2002 K-1 states that value of the

debtor's limited partnership interest was about $44,280 at the end of 2002 [Pl. Ex. 11].

The Bankruptcy Case

From April 2002, through the end of that year, the debtor was unemployed.  He received severance, consisting of salary and benefits, for four months while he searched for employment.  Additionally, the debtor and his wife maintained their lifestyle by drawing off of the reinvested C. Blair funds and proceeds from the sale of the Jacinto and Monroe properties.

Upon learning that the debtor's C. Blair account had been substantially liquidated, NBSB elected to seek additional collateral, specifically a lien against the McClungs' homestead and other jointly owned assets.  NBSB did not attempt to recover the $44,280 remaining in the C. Blair account.  It was not until May 2003, that NBSB called the Boat Loans in default, after the debtor failed to make the March 2003 interest payment.

It appears that the debtor was willing to provide additional collateral, but his wife was not.  She declined to mortgage her interest in the homestead or other real estate to recollateralize the loans, which had been concealed from her.

NBSB then sued the debtor in Michigan; later it sued both the debtor and his wife in Florida.

On April 7, 2004, the debtor filed a petition for relief under Chapter 11.  The debtor remained unemployed until shortly after the filing of his Chapter 11 petition.  He proposed an amended plan that created a "creditor trust fund" consisting of about $407,000, including $60,000 from an I.R.A., about $300,000 remaining from the pre-petition sales of the Monroe and Jacinto Properties, $35,000 to be paid by the debtor's wife, and cash from other sources.  NBSB, classified separately from other unsecured creditors, was to receive:  (a) the balance of the creditor trust fund after the payment of administrative and priority claims; (b) $5,000 per year, for six years, from the debtor's future earnings; and (c) a $70,000 second mortgage on the McClungs' home.  In exchange for her contribution of $35,000 and the grant of the second mortgage, Mrs. McClung was to receive a general release from potential fraudulent transfer claims, estimated to be as much as of $530,000, from her receipt of C. Blair distributions in 2002.

This Court found that the plan was filed in "good faith," but denied confirmation because it was not feasible. The debtor's ability, while under-employed, to continue making

the first mortgage payments on the homestead was not sufficiently established. In the event of default and foreclosure, the proposed junior lien to NBSB would be extinguished. The plan was not "fair and equitable" to NBSB either. Mrs. McClung's proposed contribution was insufficient to support both her release from liability and the "new value" required to justify a cramdown of NBSB. The case was converted to Chapter 7 on April 7, 2005.

## DISCUSSION

### Federal Rule of Civil Procedure 52(c)

At the end of NBSB's case-in-chief, the debtor moved for involuntary dismissal of Count II under Federal Rule of Civil Procedure 41(b).[4] The Court will treat the motion, however, as one for partial judgment under F.R.C.P. 52(c). Rule 52(c), made applicable by Federal Rule of Bankruptcy Procedure 7052, permits a party in a non-jury trial to move for judgment against a party who has been fully heard on an

---

[4] Earlier, the Court entered partial summary judgment in favor of the debtor on Count I and with respect to all but one of the specific transfers alleged in Count III [Dk. 114]. The remaining factual allegation in Count III (dealing with a post-petition paycheck) was later dropped by NBSB at the commencement of trial. At the conclusion of NBSB's case, the Court granted the debtor's motion to dismiss Count IV (11 U.S.C. § 727(a)(3)), but reserved ruling on the motion to involuntarily dismiss Count II, which is decided by this Memorandum Opinion and Order.

issue.   In 1991, subdivision (c) was added to Rule 52 to replace part of former Rule 41(b).

Rule 52(c) thus authorizes the court to enter judgment at any time it can appropriately make a dispositive finding of fact on the evidence. *Martinez v. United States Sugar Corp.*, 880 F. Supp. 773, 775 (M.D. Fla. 1995), *aff'd*, 77 F.3d 497 (11th Cir. 1996).   The Court may enter judgment against the plaintiff or decline to render any judgment until the close of all the evidence.   *See Smith Petroleum Serv., Inc. v. Monsanto Chem. Co.*, 420 F.2d 1103, 1116 (5th Cir. 1970)(ruling on former version of Rule 41(b)).

> In reviewing the evidence in a non-jury case, the court need not review the evidence in the light most favorable to the plaintiff.  Instead, the judge has the duty to take an unbiased view of all the evidence, both direct and circumstantial and evaluate it and accord it the weight that he believes it is entitled to receive.

*Waikiki Hobron Assocs. v. Investment Mortgage Inc. (In re Waikiki Hobron Assocs.)*, 6 B.R. 643 (Bankr. D. Hawaii 1980) (Rule 41(b))(citing *Weissinger v. U.S.*, 423 F.2d 795 (5th Cir. 1970)).   A dispositive ruling is appropriate in the present case because the debtor and the debtor's expert testified in NBSB's case-in-chief.

Willful and Malicious Injury

Section 523(a)(6) of the Bankruptcy Code excepts from discharge a debt for "willful and malicious injury by the debtor to another entity. . . ." Courts generally construe the statutory exceptions to discharge "liberally in favor of the debtor," and recognize that "'[t]he reasons for denying a discharge . . . must be real and substantial, not merely technical and conjectural.'" *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994) (citations omitted).

Under Section 523(a)(6), the creditor must establish: (1) willful conduct, (2) malice, and (3) causation. *Schlenkerman v. Goldbronn (In re Goldbronn)*, 263 B.R. 347, 366 (Bankr. M.D. Fla. 2001) (citing *Japra v. Apte (In re Apte)*, 180 B.R. 223, 230 (9th Cir. BAP 1995)); *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163-64 (11th Cir. (Ga.) 1995)). Each element must be proven by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S. Ct. 654, 112 L.Ed.2d 755 (1991).

In 1995, the Eleventh Circuit decided that a debtor acted "willfully," for purposes of Section 523(a)(6), when that person acts with the intent to cause injury or when that person is substantially certain that an injury will occur. *Hope v. Walker (In re Walker), * 48 F.3d 1161 (11th Cir. 1995)

(holding that an employer's failure to obtain statutorily required workmens' compensation insurance was not a willful and malicious injury to an injured employee). It is not clear, however, to what extent the "substantially certain" requirement is still applicable as a distinct standard of intent.

In 1998, the Supreme Court in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S. Ct. 974, 140 L.Ed. 2d 90 (1998), held that a debt arising from a physician's malpractice, based on negligent or reckless conduct, was not a willful and malicious injury excepted from discharge. The Court concluded that "[n]egligent or reckless acts . . . do not suffice to establish that a resulting injury is willful and malicious." 523 U.S. at 64.

> The word "willful" in (a)(6) modifies the word "injury," indicating that non-dischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional

14

> torts generally require that the actor
> intend "the consequences of an act," not
> simply "the act itself."

523 U.S. at 61 (citations omitted).

In a later case, involving an alleged conversion of

a creditor's collateral, Bankruptcy Judge Funk reasoned that:

> ...*Kawaauhau* stands for the proposition
> that a complainant seeking an exception to
> discharge pursuant to § 523(a)(6) must
> show that the debtor acted with the intent
> to cause injury.   The Court notes,
> however, that Eleventh Circuit precedent
> indicates that a "willful and malicious
> injury" includes acts "substantially
> certain to cause injury."   To the extent
> that *Walker* may be inconsistent with
> *Kawaauhau*, this Court strictly interprets
> *Kawaauhau* as requiring a showing of
> intentional and deliberate injury for
> purposes of § 523(a)(6).     As such,
> Defendant's failure to remit the inventory
> sale proceeds must have been done with the
> actual intent to cause injury in order to
> fit within the dischargeability exception
> of § 523(a)(6).

*In re Tomlinson*, 220 B.R. 134, 137-38 (Bankr. M.D. 1998

(citations omitted).   *Accord, In re Buck*, 220 B.R. 999 (10th

Cir. BAP 1998) (holding that the "willful" standard requires

evidence that the debtor had "motive to harm" the creditor).

Judge Funk concluded that the debtor's sale of the lender's

collateral was not a willful and malicious injury because the

debtor had used the money to keep his business going for the

purpose of repaying the debt, not of injuring the lender.

After *Kawaauhau,* proof of deliberate acts, alone, is not a sufficient basis for excepting a debt from discharge under Section 523(a)(6). The operative language of *Kawaauhau* is that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate act that leads to injury." 118 S. Ct. at 977 (emphasis in original). The *injury* must be intended -- not predictably or "substantially" certain to result from a deliberate act. *See In re Jenkins,* 258 B.R. 251 (Bankr. N.D. Ala. 2001) (finding the Supreme Court appears to require a showing of *mens rea* to injure).

Even those courts which have applied the "substantially certain" standard, post *Kawaauhau,* disagree as to whether it requires evidence of the actor's subjective intent, as determined from circumstantial evidence. *See, e.g., In re Howard,* 261 B.R. 513 (Bankr. M.D. 2001) (substantial certainty standard survives, but the standard is subjective). *See generally, In re Tinkler,* 311 B.R. 869 (Bankr. D. Colo. 2004) (discussing the split of authorities).

There is also the expressed view that a borrower's conversion of a creditor's collateral may be a *per se* "willful and malicious" injury. *See In re Giffen,* 195 B.R. 951 (Bankr.

M.D. Fla. 1996) (selling collateral in violation of the terms of an unperfected security agreement was a willful and malicious injury); *In re Russell*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001)(intentional injury when debtor intended to improperly use the creditor's collateral or proceeds from the collateral for purposes other than the payment of the debt that the property secured). This Court does not adopt a per se approach in this case.

First, the tort of conversion is an inappropriate remedy where a claim is based on a breach of contract. *United American Bank of Cent. Fla., Inc. v. Seligman*, 599 So.2d 1014, 1017 (Fla. 5th DCA 1992) (breach of contractual duty, not an act of conversion, where defendant rightfully came into possession of escrowed funds, yet failed to deliver said funds to the proper person); *Pathway Fin. v. Miami Int'l Realty Co.*, 588 So.2d 1000, 1004 (Fla. 3rd DCA 1991) (civil theft or conversion could not have occurred where defendants did not engage in fraud or misrepresentation). There is no evidence that NBSB was defrauded in the disbursement of funds to the debtor.[5]

---

[5]    The record, in fact, is clear that NBSB could monitor the status of the account at any time by a telephone call to C. Blair. There is no evidence of concealment or misrepresentation regarding the status of the account.

Given the Supreme Court's directive in *Kawaauhau*, that there must be a proven intent to injure, this Court is compelled to examine all of the circumstances necessary to discern the debtor's intent. Accordingly, when a secured creditor seeks to have a debt held nondischargeable on the basis that the debtor converted its collateral, the creditor must do more than prove that its collateral was diminished. It must establish that the debtor intended to injure the creditor. *See In re Tomlinson*, supra.

As explained in *Avco Fin. Services of Billings v. Kidd (In re Kidd)*, 219 B.R. 278 (Bankr. D. Mont. 1998):

> The problem with conversion cases . . . is that rarely are the debtors acting out of a desire to injure the creditors, even though the injury to the creditor, although not desired, is almost always substantially certain to result from a debtor's actions. Thus, the key in conversion cases is to analyze each set of circumstances on a case-by-case basis to determine whether the conversion is in the nature of an intentional tort or whether the conversion is a result of a negligent or reckless tort - but not willful or malicious.

*Id.* at 284. *See also Idaho Fed. Credit Union v. Thomason (In re Thomason)*, 225 B.R. 751 (Bankr. D. Idaho 1998); *In re Thiara*, 285 B.R. 420 (9th Cir. BAP 2002) (reckless or negligent acts of conversion which inflict consequential

injury do not fall within the ambit of exceptions to discharge for debtor's "willful and malicious injury").

It is not even clear that the debtor actually "converted" NBSB's collateral. It was C. Blair that violated the Consent Agreement by distributing funds to the McClungs. The loans were current when the debtor and his wife received the funds. There is no provision in the Consent Agreement, as is typically found in mortgages and other security agreements, requiring the debtor to hold any distributions "in trust" for the bank. There is no provision requiring the debtor to transmit any such distributions to the bank while the loans were current.

C. Blair breached the Consent Agreement by making distributions to the debtor and his wife. Nothing in evidence suggests that this breach of the Consent Agreement was anything more than negligent or reckless. When the partnership distributions were made, the debtor was current on his loan payments. Later, he pre-paid another $150,000 of the outstanding principal. The timing of the withdrawals from C. Blair coincided with either the debtor's payment of income taxes and interest payments on the Boat Loans or with C. Blair's distributions to all limited partners, not with any evidence of malice or intention to harm NBSB.

C. Blair, was subject to the same contractual requirements as the debtor with respect to withdrawals and distributions from the partnership. The debtor candidly admitted that he did not contact NBSB about the distributions or termination of C. Blair. Rather, he presumed that C. Blair was obtaining the appropriate consent from NBSB. Indeed, on direct examination in NBSB's case, the debtor pointed to an e-mail from which he understood that C. Blair was obtaining "everyone's paperwork" in response to an early request for a withdrawal. [Pl. Ex. 10 (BAM 128)]. He acknowledged NBSB's lien, but presumed that NBSB had given C. Blair its consent pursuant to the Consent Agreement. No evidence was introduced to suggest that the debtor's presumption, although incorrect, was implausible or even unreasonable in view of the fact that he was current on his payments and had made significant principal reductions.

Under either a subjective or objective standard, to the extent the standard applies, it was not "substantially certain" that NBSB would be injured when the debtor retained and reinvested the funds distributed by C. Blair. Before the large distributions were received in June 2002, the debtor had pre-paid about $717,000, or about 55%, of the principal amount of the Boat Loans from the sales of the boats, even though

they were not subject to any lien.  That left about $517,000 outstanding that was secured by about $828,000 in the C. Blair account in June 2002.

The debtor later pre-paid another $150,000 from the C. Blair funds that he received in June 2002.  At the end of August 2002, the principal balance was about $367,612, secured by $44,280 in the C. Blair account; but the debtor held over $300,000 in non-exempt assets.  Thus, until about February 2003, the debtor had sufficient assets to collateralize the Boat Loans or keep them current [Pl. Ex. 8].

Malicious injury, within the meaning of Section 523(a)(6), requires evidence that the injury was "wrongful and without just cause or excessive, even in the absence of hatred, spite or ill-will."  *In re Latch*, 820 F. 2d 1163 (11th Cir. 1987).  There must be a consciousness of wrongdoing.  *In re Stanley,* 66 F.3d 664, 668 (4th Cir. 1995).  It is this knowledge of wrongdoing that is the key to malicious injury under Section 523(a)(6), not the wrongfulness of the debtor's actions.  *In re Posta*, 866 F.2d 364, 367 (10th Cir. 1989); *In re Cardillo*, 39 B.R. 548, 550 (Bankr. D. Mass. 1984).  *Accord, In re Grier,* 124 B.R. 229, 233 (Bankr. W.D. Tex. 1991) ("Simply because the sale was in violation of the security agreement and was in fact an intentional sale on the part of

the debtor should not be enough to trigger a finding of malice."). *See also, Davis v. Aetna Acceptance Co.,* 293 U.S. at 328, 332, 55 S. Ct. at 153 (a willful and malicious injury does not automatically result from every tortious conversion). *E.g., In re Caruth,* 2002 WL 1770523 (Bankr. N. D. Iowa 2002) (holding that malicious conduct must be targeted at the creditor and finding no malice where debtor sold collateral and used the proceeds to pay bills).

The debtor was unemployed for most of 2002.   The debtor eventually liquidated his securities accounts to pay expenses and maintain his lifestyle.    Undoubtedly, the debtor's maintenance of his $20,000 per month lifestyle was reckless.    It appears, however, that instead of intending injury to the bank, the debtor was in denial about his financial situation, believing that he would regain suitable employment.   The debtor's actions were directed at maintaining his lifestyle and marital harmony.[6]  His conduct may have been reckless, but was not directed at NBSB.    Even though approximately $430,000 of the funds received from C. Blair were sheltered from collection in the Monroe and Jacinto Properties, the remaining funds totaling about $351,280, were

---

[6]   At the time of trial the McClungs had separated.

not so sheltered.  The debtor elected instead to take out a $300,000 mortgage to acquire the Monroe Property, which belies the charge that he intended to injure NBSB.  Considering all of the circumstances -- (a) it was C. Blair that elected, in 2002, to terminate its operations and make distributions to partners, (b) C. Blair failed to notify NBSB, (c) in June of 2002, the McClungs paid off NBSB's $900,000 bridge loan, (d) the debtor refrained from sheltering $307,000 he received from C. Blair, opting instead to buy the Monroe Property with a $300,000 mortgage loan, (e) the debtor had already prepaid a significant portion of the Boat Loans, and (f) the principal balances of the Boat Loans were not due until 2010 -- the Court is unable to conclude that the debtor acted with malice directed at NBSB or intended to injure NBSB.

## CONCLUSION

In reviewing the evidence and assessing the credibility of the witnesses, the Court concludes that the debtor, even though unemployed at the time, did not intend to injure NBSB when he and his wife received and retained the funds from the limited partnership account pledged to the bank.  The debtor was motivated more by marital and personal concerns - maybe irresponsibly so - than by an intent to injure the bank.  At that time, it was not even "substantially

23

certain" that the bank would be injured.  The Court concludes that the debtor did not willfully and maliciously injure NBSB. Accordingly, it is hereby

ORDERED:

1.  The debtor's Motion for Involuntary Dismissal, taken as a motion for partial judgment on Count II be, and the same is hereby, granted.

2.  A separate partial judgment shall be entered in favor of the debtor and against NBSB with respect to Count II.

DONE and ORDERED at Tampa, Florida, on December 6, 2005.

K. RODNEY MAY
U.S. Bankruptcy Judge

Copies to:

Michael L. McClung, Debtor, 2222 61st Street, Sarasota, Florida 34242

Roberta A. Colton, Esquire, Trenam, Kemker, et al., Attorney for Debtor, P. O. Box 1102, Tampa, Florida  33601

Michael P. Brundage, Esquire, Hill, Ward, et al., Attorney for Creditor, P. O. Box 2231, Tampa, Florida  33601

Traci Stevenson, Esquire, Chapter 7 Trustee, P. O. Box 86690, Madeira Beach, FL 33738

United States Trustee, Timberlake Annex, Suite 1200, 501 E. Polk Street, Tampa, Florida  33602

1323241v1